JONES, LEE & CO. v. H. S. BRITTON and R. W. PITTMAN.

*Homestead— Waste—Injunction Against.*

A judgment is now a lien upon land to which the debtor is entitled as a homestead, and when the land is not worth more than $1,000, and much of its value consists in timber trees, the debtor, or other person to whom he has sold them, may be enjoined from cutting such trees for profit.

DAVIS, J., dissented as to the general doctrine, and as to its application to this case, and AVERY, J., as to the general doctrine.

MOTION, to vacate an injunction in a civil action, heard before *Graves, J.,* at Spring Term, 1888, of the Superior Court of NORTHAMPTON County.

The plaintiff Jones had docketed his judgment against the defendant Britton for $50, with interest from the 29th of January, 1887, and for costs; and at the time the same was so docketed the said defendant was a citizen of this State and entitled to the right of homestead, and was seized and possessed of the land specified in the complaint. He had no personal property subject to levy, and the land mentioned

was all he had, was of value not exceeding $1,000, and he was entitled to have his homestead therein.

The following is a copy of so much of the complaint as it is material to report:

" 6. That plaintiffs are further informed and believe that, since the docketing said transcript of said judgment, the defendant Britton has sold and conveyed to defendant R. W. Pittman the timber trees standing on said tract of land; that a good portion of said tract of land is cleared and in a state of cultivation, while the other portion is valuable, chiefly and principally, for its timber trees.

" 7. That the defendant Pittman, by virtue of his said purchase, is now cutting and removing from said land the said timber trees.

" 8. That defendant Britton is still living in the county aforesaid, and the said judgment is unpaid and in full force.

" 9. That if the defendants are allowed to cut and remove said timber trees they will greatly reduce and impair plaintiffs' security for said judgment debt and inflict upon plaintiffs irreparable damage.

" 10. That there now exist on said land a mortgage lien and a judgment lien amounting to several hundred dollars, prior to the said lien of plaintiffs, as plaintiffs are informed and believe.

" 11. That plaintiffs have commenced an action in the Superior Court of said county to enjoin defendants from cutting and removing said timber trees, and have caused a summons to be issued commanding the defendants to appear at next term of said Superior Court."

A judge at chambers granted an injunction pending the action until the hearing upon the merits. At the final hearing the Court dissolved that injunction and " ordered and decreed that the plaintiffs are not entitled to have the defendants enjoined from cutting said timber trees," &c. The

plaintiffs having excepted, appealed from that order to this
Court.

*Mr. B. B. Winborne* (by brief), for the plaintiffs.
*Mr. W. H. Day,* for the defendants.

MERRIMON, J. (after stating the case as above). The Con-
stitution (article 10, § 2) gives and secures to every resident
of this State the right of homestead. If he has land he is
entitled to have a homestead therein, as allowed, " *exempt
from sale* under execution, or other final process obtained on
any debt," subject to certain specified exceptions. The several
statutory provisions prescribing how it shall be valued and
laid off to the owner thereof do not give it. They serve the
purpose of ascertaining the value thereof, locating it particu-
larly and defining its limits.   Neither the constitutional pro-
vision cited, nor any statute, creates, defines, or limits an
estate in the owner of the homestead in the land embraced
by it—he has, and continues to have, such estate in the lands
embraced by it as he may have acquired from any source,
unaffected as to its character or extent, save that while the
homestead as allowed lasts, it remains " exempt from sale
under execution or other final process obtained on any debt,"
and it lasts during the life of the owner thereof; and, after
his death, during the minority of his children, or any one of
them, and the widowhood of his widow, unless she be the
owner of a homestead in her own right.   Const., art. 10, §§ 2,
3, 5.

The condition and measure of the estate of the owner of
the homestead, in the land, is not changed by, or because of,
the homestead—the estate, unchanged, continues—the restric-
tion, the limitation that distinguishes the homestead, is upon
the right of the judgment creditor to have the land sold by
execution or other proper final process to satisfy his docketed
judgment, which constitutes his lien upon the land.   So

that, when the owner sells his estate, whatever its condition or measure, in the land constituting his homestead, he sells it subject to his judgment creditor's lien, if there be such creditor; but he also sells the advantage that it shall not be sold at the instance of the creditor, until the exemption " from sale under execution or other final process obtained on any debt" shall be over. It is this exemption from sale that distinguishes the homestead from other lands of its owner. It suspends and prevents the remedy of the creditor by execution, or other final process, as long as it continues. *Markham* v. *Hicks*, 90 N. C, 204; *Rankin* v. *Shaw*, 94 N. C, 405.

The rights of the owner of the homestead, as to it, are not abrogated or essentially different from his rights as to other lands he may own, except when there are liens upon it that cannot be enforced while it continues to be the homestead. When such liens exist, he is bound in conscience, and by the principles of justice, to use and care for the homestead prudently and fairly, in the way and manner such property is employed by ordinarily prudent men, in continuously, in the course of living promoting their just advantage and the support, convenience and comfort of their families. What the character and extent of such use shall be, will frequently depend on the nature and condition of the homestead.

The purpose of the law is to allow the debtor to have his homestead—his home—free from sale under final process, as prescribed, for the benefit of himself and his family. It is not contemplated or intended that he shall arbitrarily destroy its value, by unnecessarily cutting the timber trees that may be on it, or by pulling down and destroying the buildings on it, so as to disappoint the just rights and expectations of the creditor having a judgment lien upon it. The latter, when the exemption from sale is over, should find the property—not exhausted and rendered valueless—but substantially as it was when the exemption began, less the loss and depreciation arising from the reasonable use of it, and wear

and tear of buildings. The law expressly gives the judgment creditor a lien on the homestead. This lien is not meaningless and nugatory; it implies that the creditor shall have the property devoted to the satisfaction of his judgment debt, as far as may be necessary, when and as soon as the exemption of it from sale shall be over. The law is true and sincere—it does not thus create and allow a lien in favor of the creditor, and leave the owner of the homestead at liberty to destroy the property, and thus render such lien worthless. As we have seen, he is allowed to live upon and use it, but not destroy or impair the substance of it, as against the creditor having a lien, nor for the like reason will· the person to whom he may sell his homestead be allowed to do so.

Obviously, the creditor having such lien is entitled to have the property, to which it attaches, protected against the destruction or unreasonable impairment of it prejudicial to that lien. As it cannot be enforced while the exemption of the property from sale lasts, the property will be properly protected during that time, so that the creditor may, in the end, have the benefit of his lien. A Court of Equity will not hesitate, in a proper case, to interfere by injunction, or in other proper way, for such purpose. Otherwise, the creditor would have no remedy during the exemption. *Webb* v. *Boyle*, 63 N. C, 271; *Gordon* v. *Lowther*, 75 N. C., 193; *Braswell* v. *Morehead*, Bus. Eq., 26; *Cassup* v. *Bates*, 11 Conn., 51.

In the case before us, the defendant Britton was entitled to his homestead in the lands described in the complaint. He sold the timber trees standing thereon to his co-defendant, to be cut down and carried away. The plaintiff, at the time of such sale, had a docketed judgment against the owner of the homestead, which constituted a lien on the land. The owner had no right to thus sell the timber trees, simply for gain; he could, lawfully, only cut and use such of them as were necessary for the reasonable use of the

homestead property—for making repairs, necessary houses, fences and the like. To sell and cut away all the timber trees, for simple gain, was to substantially impair the homestead property subject to the lien, and this, for the reason stated, is not allowable.

This is not strictly an action to prevent waste, but to prevent an injury in the nature of waste, growing out of the peculiar relations of the parties, brought about by the exemption of the property from sale under final process, until the homestead shall be over. Courts of equity frequently interfere in a great variety of cases, having peculiar characteristics, to prevent injuries to property, when the courts of common law cannot afford adequate relief in the preservation of the same. Story's Eq. Jur., § 912, *et seq.*

There is, therefore, error. The order denying the injunction must be reversed, and an order entered granting an injunction restraining the defendants from cutting the timber trees on the land for any purpose other than necessary repairs and improvements thereon.

Error.

DAVIS, J. (dissenting). I do not think that His Honor below erred in dissolving the plaintiff's injunction, and I, therefore, do not concur in the opinion of my brethren.

The homestead law has been a fruitful source of litigation in the past, and I think a new and wide gate for additional litigation will be thrown open when it is understood that the creditor has, in any way, the right to overlook and control the extent and manner in which the debtor shall use his homestead in the support and comfort of his family. In the absence of any wanton and malicious waste and destruction of the property, I think he may make any use of it that he may deem most advantageous—not to the creditor—but to himself and family, and when so used the Court has no right to molest or interfere with him.

How can he derive any benefit from land only valuable for its timber (and we know that there are many such tracts of land) if he is not allowed to sell a timber tree worth $1, because, forsooth, it will be worth $1 less to the creditor, when the homestead falls in? Such land may be valuable, but it is of no value to him. There is hardly a prudent man to be found, who owns land valuable only or chiefly for its timber, who does not gladly avail himself of a saw-mill to realize some advantage by the sale of timber; and why should the owner of a homestead be denied that right?

It will not do to say that he may use the timber himself, to the extent that it may be necessary for building or repairing, or improving the homestead. Having nothing but the land, which is only valuable for timber, he could sell none of it to buy bread or clothing, or even to buy nails or window-glass to put in his house; and to tell him, under such circumstances, that he was the owner of, or had any interest in, such land, would seem a cruel and tantalizing mockery.

I confess my inability to understand the nature of the lien of a judgment upon the homestead. It cannot be, I think, a lien upon the land, or any interest in the land, during the life of the owner of the homestead, or that of his widow, or the minority of his youngest child.

In *Markham* v. *Hicks*, 90 N. C., 204, the Chief Justice says: "The estate of the debtor remains after the allotment as before, the same, whether it be in fee, for life, or for years. It is *this estate in its entirety* in the exempt land which the creditor is not allowed to sell under final process by the mandate of the Constitution, and to which no judgment lien now attaches, where the debt was contracted or the cause of action accrued since May 1, 1877. *The Code,* § 501, subsec 4.

"It is to be remembered that when the Constitution was framed and adopted, no lien upon the land was created by the rendition of a judgment, and it attached only when the execution issued, running back to its *teste* for a commence-

ment, and therefore the prohibition was a full and ample protection, not only against a sale, but against any lien upon the exempt property, for there could be no lien unless the officer having the final process could sell.

"The General Assembly, in the enactment of *The Code*, seems to have interpreted the Constitution as putting an interdict upon a sale of the *land set apart*, that is, of the debtor's estate therein, whatever it might be, until the expiration of the period of exemption, thus rendering unnecessary the incorporation into *The Code* of the act of 1870. A glance at some of its sections will make this manifest."

Without expressing any opinion upon the effect of the act of 1885, ch. 359, amending section 501, subsec. 4, of *The Code*, and as to whether the Legislature can, as against a homestead debtor, give any effect to a judgment which it would not have had when the Constitution was adopted, I am able to see how a lien may *relate back* to the date of its *teste;* but I find some difficulty in understanding how the lien of a *judgment* may reach *forward* to the termination of the homestead interest, and by so doing give it a present validity and effect, to deprive the owner of the homestead of the right to do that which, but for the judgment, he might do. The judgments and liens, as to the rights of the owner of the homestead, it seems to me, can have no force as against the homestead debtor, but are perfectly dormant as to him, being deprived of all vitality by the power of the Constitution, though they may spring into life as soon as the homestead interest expires, and take effect then, in the order of priority. The judgment can give the creditor no vested right to the homestead, nor any right of any kind except in subordination to the absolute and untrammeled right of the owner of it, to use it in any way he may choose for the support and comfort of himself and family. The judgment creditor is in no sense like a remainderman or reversioner. He cannot bring "the old action of waste," as it was at com-

mon law, nor is he embraced in any one of the classes " for and against whom an action of waste lies" under *The Code,* §§ 625, *et seq.*

If an action of waste would lie, I think neither the old remedy by injunction and sequestration, nor any one of the provisions given by section 338 of *The Code,* can be invoked.

If it can be said that the cutting and selling the timber by the owner of the homestead, though conducive and perhaps necessary to the support and comfort of himself and family, impairs, *pro tanto,* the security of the creditor, so would the continuous and excessive cultivation of a fertile field or lot exhaust it and render it barren, but it will hardly be insisted that this is a matter with which the creditor could interpose   It would be *damnum absque injuria.*   The rights of the debtor are fixed by the Constitution, and are absolute, and cannot be limited by legislation, nor can the homestead, in my opinion, be taken *in custodia legis,* or its use for the support and comfort of the debtor be in any way disturbed by legal process.   He can in no way be considered as a mortgagor or tenant for life, any more than the creditor can be likened to a mortgagor or remainderman or reversioner.   If he has an estate in fee, it so remains after the allotment of the homestead as before, the only difference being, that as to the homestead the creditor can acquire no rights, and as to the estate after the termination of the homestead the debtor can make no disposition as against the judgment creditor.

If the creditor has the right to enjoin the debtor from cutting down and selling timber, why may he not have a receiver appointed to take and invest the proceeds—first, for the use of the debtor during the continuance of the homestead, and then to be paid to the creditor?   No one would entertain such a proposition for a moment, and yet it gives the debtor some benefit, and would be far more just and equitable than to compel him to abstain from reaping any advantage from his

forest land, because it may blight the expectations of the creditor, looking forward to the time when the timber shall become valuable to him.

In *Poe* v. *Hardie*, 65 N. C., 447, it is said "the estate in the homestead as created by the Constitution is a determinable fee, and the tenant was not 'impeachable for waste,' even before the act of 1870. That act was intended to protect the owner of a homestead against any vexatious litigation which might be instituted by the purchaser of a reversionary interest."

Thompson on Homestead and Exemptions, referring to the various questions that have been presented in regard to the nature of "the estate of homestead," says:

" These questions have all, under the various phases, addressed themselves to the courts. It would seem, upon principle, that they are questions with which the creditor can have nothing to do." Section 165.

Again, it is said, § 635: "Although some courts treat the homestead as an intermediate estate in the land, the creditor cannot seize and se 1 the reversion. If it were otherwise, (quoting the authority of 'a learned Court') * * * by depriving the debtor of all use of the homestead except the mere occupation of it, a creditor might contribute largely to such a state of things that would drive him from the homestead to the poor-house."

In *Markham* v. *Hicks*, 90 N. C , 204, I can find nothing in conflict with what was said in *Poe* v. *Hardie*, so far as it relates to the question before us. The Chief Justice said: " The correct view of the Constitution and the subsidiary statutes is taken and expressed by BYNUM, J., in *Bank* v. *Green*, 78 N. C., 247: ' Their legal effect is simply to protect the occupant in the enjoyment of the *land set apart as a homestead*, unmolested by creditors.' "

If the law will not allow the reversion to be sold, because, as declared by this Court, its purpose is that the owner of

the homestead shall not be harassed or vexed by a purchaser who will become a reversioner, ought the Court to allow that purpose to be defeated by permitting him to be harassed and vexed by one, or it may be a dozen, judgment creditors? Ought the Court to allow a judgment creditor to do just what it was intended there should be no purchaser to do? Can it invest a creditor with a power denied to a purchaser?

But even conceding that, in a proper case, the plaintiff would be entitled to the extraordinary relief asked, I do not think that the allegations of the complaint are sufficient to entitle him to it.

It is true, that the complaint alleges that the plaintiff has a docketed judgment of $50.30, with interest from January, 1887, and $1.65 costs, against the defendant Britton, and that there exists prior liens " amounting to several hundred dollars;" that the land contains 200 acres, " not worth to exceed $1,000;" that " a good portion of said land is cleared and in a state of cultivation, while the other portion is valuable chiefly and principally for its timber trees;" that the defendant Britton has sold the timber trees to the defendant Pittman, who is cutting and removing them, which, if allowed, " will greatly reduce and impair the plaintiff's security for said judgment debt, and inflict upon plaintiff irreparable damage." The amount of liens on the land is left indefinite, and it does not appear that the timber, if sold, will not leave the land amply sufficient to pay the debts, or that defendant Pittman is insolvent. It does not allege that the value of the land, for its ordinary use, will be impaired, or that all, or how much of the timber, is being cut and sold, or that a sufficiency will not be left for building, repairs, &c.—that is, *for house-bote, plow-bote, fire-bote, hedge-bote, &c.*

Facts should be stated from which the Court can see, if true, that the damage is irreparable, and I think this has not been done.

Counsel for the plaintiff refers to chapter 401, Acts of 1885, which enacts: " That in an application to enjoin a trespass on land, it shall not be necessary to allege the insolvency of the defendant, when the trespass complained of is continuous in its nature, or is the cutting or destruction of timber trees."

Are the defendants such trespassers " on land" as the statute contemplates? There is no allegation that they are trespassers on land at all.

I know of no precedent in this State, or elsewhere, where the constitutional provision is like ours, for such an interference with the right of the owner of a homestead to use it as he may think most conducive to the comfort and support of himself and family, and I do not concur in making one.

In the earlier days of the homestead law in this State, it seems to me that the judicial pendulum lost its equilibrium, and, swayed by a benevolent sentiment prompted by the impoverished condition of the State, it was greatly on the side of the homestead debtor. Having a Constitution which guarantees the unmolested right to a homestead, where its owner is denied the right to use it in any way that may best contribute to his support and comfort without being molested, harassed and vexed by creditors in regard to the manner in which he shall use it, it seems to me that the pendulum is swinging in the other direction.

SHEPHERD, J. (concurring). If any question is well settled in this State, it is, that all of the lands of a debtor, the homestead inclusive, are subject to the lien of a docketed judgment. Ch. 358, Acts 1885; *Rankin* v. *Shaw*, 94 N. C., 405. It is unnecessary that there should be a levy. *Miller* v. *Miller*, 89 N. C. 402; *Mebane* v. *Layton, ibid.*, 396.

Whatever may be said as to the effect of the general lien of a docketed judgment in other States, our decisions place it on the same footing, so far as its binding effect upon the

land is concerned, as if a levy had been actually made. *Sawyers* v. *Sawyers,* 93 N. C., 321 ; *Lytle* v. *Lytle,* 94 N. C., 683; *Lee* v. *Eure,* 93 N. C., 5 ; *Miller* v. *Miller, supra.* Such a lien is, therefore, a "charge" upon the lands of the debtor, and "in the same way as if he had charged them in *writing under his hand.*" Rapalje and Lawrence's Law Dict. Its holder is recognized in a court of equity as a proper and necessary party, with a mortgagee and other incumbrancers in the adjustment of priorities, and the administration of other equities between persons interested in the property. Adams' Eq., 145; *Hinton* v. *Adrian,* 86 N. C., 61 ; *Wilson* v. *Patton,* 87 N. C., 318; *Lockhart* v. *Bell,* 90 N. C., 499. It is a *vested right.* If, then, the judgment creditor has a charge upon the land, why should he not be entitled, as are others having charges, to the aid of the Court, in preventing the impairment of his security by the arbitrary acts of the judgment debtor. But it is said that the extension of such relief to a judgment creditor will be a fruitful source of litigation. This should be addressed to the General Assembly, which has seen fit to *restore* the lien of a docketed judgment. Ch. 359, Acts 1885. Again, it is said, that the act restoring this lien may be unconstitutional. I search in vain to find any authority for such a proposition   The Constitution simply says that the homestead shall "be exempt from sale under execution, or other final process." Art. 10, § 2. It does not say that it shall be exempt from a lien. The validity of such a lien is recognized in *Wilson.*v. *Patton,* and *Hinson* v. *Adrian, supra,* and it is not an open question in this State. It is also asked, how can the debtor derive any benefit from land only valuable for timber? This forcible suggestion loses its power when applied to a case like this, "where a good portion of the land is cleared and in a state of cultivation." It is also urged, that in *Markham* v. *Hicks,* 90 N. C., 204, it is said that "it is this estate in its *entirety*" which the creditor is not allowed to sell. A very cursory

examination of that case will show that it refers not to the manner of using the exempted land, but simply to the sale of what is called the "reversionary interest."

Again, it is argued that a judgment creditor cannot bring an action of waste. No one pretends that he can, as he is neither a reversioner nor a remainderman, but having a *charge* upon the land, he has a right to invoke the aid of a court of equity in certain cases to prevent the impairment of his security. This is so well settled as to charges generally that it is unnecessary to cite in support of it the various works on equity jurisprudence. That equity has interfered to protect the lien of a judgment creditor will be seen by reference to *Webb* v. *Boyle,* 63 N. C., 271 ; *High on Injunctions,* § 252, and the case from Connecticut cited in the opinion of the Court by Justice MERRIMON. But it is said that Thompson, in his work on Homesteads, remarks (§ 165) that "these questions have all, under various phases, addressed themselves to the courts. It would seem, upon principle, that they are questions with which the creditor can have nothing to do." What questions ? A glance at the chapter (which is entitled "Of the estate or interest in lands and goods necessary to support an exemption ") will show that the questions are, whether a debtor can have his homestead assigned in equitable estates for years, in remainder, etc.; and yet this is cited as authority as to the *manner* in which the homestead shall be *used* when assigned. Equally inapplicable to the question before us is § 635 of the same work, which relates to the sale of the " reversion " only. It is confidently asserted, however, that a homestead is " a determinable fee," and that the homesteader is not impeachable for waste, and, therefore, cannot be enjoined in a case like this.

Even if the homestead were a "determinable fee," if it had a *charge* upon it, it would be as much subject to the supervision of a court of equity as if the charge were upon

other estates, whether for years, for life, or in fee. So the question as to whether the homestead is a determinable fee has nothing whatever to do with the decision of this case. But the definition affords a striking illustration of the almost bewildering confusion of terms, which has grown out of the word " homestead."

Another illustration is presented by the use of the words " reversionary estate," when there can *technically* be no " reversion " in the case of a homestead, for the estate has never *been changed*. It is hard to understand how the words in the Constitution, to the effect that a certain parcel of land shall not be sold upon final process for a limited period, can be made the basis upon which to erect estates and create reversions. These words in the Constitution amount to nothing more or less than a *stay of execution* for the period mentioned, and the " inadvertent " assumption, that a new estate is conferred upon the judgment debtor, is swept away by the convincing logic of BYNUM, J., in *Bank* v. *Green*, 78 N. C., 247, approved by our present Chief Justice in delivering the opinion in *Markham* v. *Hicks*, 90 N. C., 204, and *Rankin* v. *Shaw*, 94 N. C., 405. Judge BYNUM says that "the homestead has been called a determinable fee, but as we have seen that no new estate has been conferred upon the owner and no limitation upon his old estate imposed, it is obvious that it would be more correct to say that there is conferred upon him a determinable exemption from the payment of his debts, in respect to that particular property allotted to him." Now, if the homestead provision confers no new estate upon the judgment debtor, but simply exempts it, not from a lien, but from sale upon final process for a limited period, why, I ask again, should the lien—the *charge* conferred by a docketed judgment—be alone exempted from the protective power of a court of equity? I am clearly of the opinion that there is nothing in the Constitution or the laws which warrants such an exception.

But, while I think that a judgment creditor, in a proper case, is entitled to this protection, I would, by no means, be understood as assenting to any inference, which may be improperly made, that the judgment debtor is to be assimilated, in respect to the use of the property, to tenants for life. In my opinion, he has a right to commit the most injurious acts of waste, and he is not to be molested so long as he leaves enough (though it be but the bare land) to satisfy the lien. Nay, he may even *impair* the security, if he does it in a *prudent* use of the property, for the purposes of which. it is alone susceptible of being used, such as the use of mining lands, shingle swamps, and even land valuable only for timber. I think the principles we have laid down are applicable to the present case. Here, it is admitted that the security will be impaired, that the land is not alone valuable for timber, but that a good portion of it is cleared and in a state of cultivation, and that the defendant has sold the timber trees, and is about to remove them. Ordinarily, it is necessary that the facts should be set out, in order that the Court may see whether irreparable injury will be done. This, I conceive, is wholly unnecessary, where the *allegation* of irreparable injury is, as in this case, admitted. In the administration of this preventive remedy by the Court, each case must be governed, of course, by its peculiar circumstances, and it is, therefore, difficult to lay down any general rule of application. I think the facts in this case entitle the plaintiff to the injunction, as prayed for.

AVERY, J. (dissenting). I regret that, after patient consideration of the argument, and investigation of every phase of the subject, I feel constrained to dissent. My conclusions are embodied in two propositions, each of which I shall discuss as briefly as the importance of the questions involved will permit:

1. If the homestead is to be treated as an estate, with all of the incident, rights and liabilities on the part of the owner that the law attaches to other analogous estates, the owner is not impeachable for waste, and if a Court can enjoin him from injury to the land at all, it can interfere only when the waste is wanton, malicious or extravagant, and not simply because, in the enjoyment of the profits, he may be doing permanent injury to the land, and thereby lessening the security of the judgment creditor.

The homestead right was engrafted on our system of laws in North Carolina to meet a distressing emergency. Our people were overwhelmed with debt, incurred before their slaves were emancipated, and their stocks had become worthless. The liability remained when their property was destroyed. The unconstitutional stay laws, and the attempt to make the homestead provision retroactive, sufficiently evince the fact that the law-makers were exponents of a popular sentiment, which demanded a temporary suspension of sales, and a present and future provision of a home, whose boundary line those armed with execution or other process for the collection or even security of debts could never cross. Where the meaning of the framers of our Constitution of 1868 may be left in doubt, by reason of any ambiguity of the terms in which it is expressed, we are at liberty to consider the circumstances that surrounded them in interpreting its provisions.

This principle of construction will apply with equal force, however we may settle the vexed question, whether the homestead is to be considered as an estate, or only a personal right of exemption, attaching to the land first, when the creditor is armed with authority to subject it to sale. Upon this point opinions of this Court, delivered at different times, are, apparently, conflicting.

In *Poe* v. *Hardie*, 65 N. C., 447, the Court says: "The *estate in* the homestead, as created by the Constitution, is a

determinable fee, and the tenant was not impeachable for waste even before the passage of the act above referred to (the act of 1870, forbidding sale of the reversionary interest till the termination of the homestead right). That act was intended to protect the owner of a homestead from any vexatious litigation, which might be instituted by the purchaser of a reversionary interest."

In *Bank* v. *Green*, 78 N. C., 247, it is said : " The homestead has been called a determinable fee, but as we have seen that no new estate has been conferred upon the owner, and no limitation upon his old estate imposed, it is obvious that it would be more correct to say, that there is conferred upon him a determinable exemption from the payment of his debts in respect to the particular property allotted to him."

In *Littlejohn* v. *Egerton*, 77 N. C., 379, Chief Justice PEARSON, for the Court, says : " A condition is a quality annexed to land, whereby an estate may be defeated. A homestead is a quality annexed to land, whereby an estate is exempted from sale under execution for debt." The laws enacted to make the provisions of the Constitution operative (Bat. Rev. ch. 55, §§ 26 and 27) designate the interest after the termination of the life estate as a reversionary interest.

In *Keener* v. *Goodson*, 89 N. C., 273, it is said that the assignment of a homestead has no other effect than to attach to his *existing* estate a quality of exemption from sale under execution.

After a sale of the reversion, or a conveyance by the owner, with joinder of the wife, of an allotted homestead, or the sale by a childless widow of her homestead interest allotted to her in her husband's land, the idea that there are two existing estates in the land is not unreasonable.

Prior to the passage of the act exempting the reversionary interest from sale, there were, doubtless, many sales of the reversionary interest in the land—to take effect in enjoyment

after the expiration of a life or lives in being (the life of the husband or the lives of husband and wife) and possibly after twenty-one years. When our law-makers called the interests that were then being sold on the first Monday of every month, at every court-house in the State, reversionary interests, they certainly adopted a term that, according to its definition, more nearly described the interest that purchasers were acquiring than any other term known to the law. " A *reversion* is the remnant of an estate continuing in the grantor undisposed of, after the grant of a particular interest. It differs from a remainder. It arises *by act of law*, a remainder by act of the parties." 2 Bl. Com., 175. The act referred to proceeds upon the idea that the particular estate was dedicated to the use of the debtor and his family, under the provisions of law, while the reversionary estate or interest remained in the debtor subject to the lien of any judgment that might be docketed in the county where the land lies. This Court approves of that view of the matter in holding that it is not necessary that the wife should join the husband in a conveyance of such reversionary interest. *Jenkins* v. *Bobbitt*, 77 N. C., 385.

On the other hand, where the reversionary interest was sold before the act of 1870 was passed, an interest that had been carved out of the whole fee, and dedicated by law to the use of the family, remained unsold. It might continue during the life of a husband or the widowhood of his wife, and twenty-one years in some instances. Shall we call it a quality of exemption? When husband and wife joined, with privy examination of the latter, in conveying all the interests they had power to convey in the husband's only tract of land, worth less than a thousand dollars, and subject to the lien of a judgment, Justice ASHE says for this Court (in *Adrian* v. *Shaw*, 82 N. C., 474), that their bargainee " acquired a good and defeasible title for the life, at least, of Jackson, against the creditors of Jackson, notwithstanding he may

since have removed from the State." The same case was before the Court again (84 N. C., 832), when the Court refused to overrule, and adhered thereby to the idea that the grantee of Jackson took a life estate, as that was the only point involved in either appeal. When the owner sold the life estate, as then decided, he still held, subject to the lien of docketed judgments, all of the fee simple that remained after a life estate, and an interest that was carved out of the whole estate by act of law, and kept in the grantor, though he was trying to alien the fee simple. The estate remaining in Jackson fills exactly the definition of a reversion. It did remain in him, subject to the lien, because the sale under execution, without assignment of the homestead, was void. *Lambert* v. *Kinnery,* 74 N. C., 348; *Littlejohn* v. *Eyerton, supra; Arnold* v. *Estis,* 92 N. C., 162.

It has been contended, not without reason, therefore, that such an interest was a determinable fee, and (for the same reason that operated in the case of tenant in tail after possibility of issue extinct) because the tenant once had an estate of inheritance. 2 Bl. Com., 124-5, § 167. If we construe the Constitution as marking out two estates as soon as the land becomes liable to sale under a lien, the "homesteader" is not impeachable for waste, on the one hand, and on the other, the only adjudicated case, outside of our own State, cited and relied on to sustain the opinion of the Court in this case, is *Camp* v. *Bates,* 11 Conn Reports, 51, and in that opinion (on page 57) Chief Justice WILLIAMS says: "Even a tenant in tail, *without impeachment* of waste, has been restrained from *wanton, malicious* or *extravagant waste,*" and in support of that proposition, cited four Chancery cases, decided in the English Court: *Vane* v. *Barnard,* 2 Vernon, 739; *Packingham's Case,* 3 Atkyns, 217; *Strathmore* v. *Bowes,* 2 Brown's Ch. Reports; *Chamberlayne* v. *Dummer,* 3 Brown's Ch., 549.

An examination of these authorities brings out the judicial history of the efforts to restrain tenants not impeachable, and those liable for waste, and shows how the principle stated in *Camp* v. *Bates*, and that announced by this Court in *Crawley* v. *Timberlake*, 2 Ired. Eq., 460, was established. In the English and American courts it has been held that no tenant for life, not liable for waste, could be restrained by the courts at the instance of the remainderman or reversioner, unless it was shown that the waste was wanton, malicious or extravagant. In England the rule was held to apply where the life tenant maliciously injured or destroyed houses or ornamental shade trees, whether transplanted or left standing for shade along avenues or parks, but it was expressly held that such tenants by virtue of their exemption from liability for waste, could cut *ad libitum* forest trees for timber, as will appear by reference to the cases cited *supra.* ·

"A tenant for life, without impeachment for waste, may fell trees fit for the purpose of timber, though young and not such as would be felled in a course of husband-like management of the estate (*Burges* v. *Lamb*, 16 Ves., 174–177); but he will be restrained, though having the legal right so to do, from what has been termed malicious, extravagant or wanton waste; for instance, the total destruction of a wood or coppice. So he will be restrained from cutting down trees planted or left standing for ornament, but not merely because they may be really ornamental." Spencer's Eq. Jur., pages 570 to 573; *Williams* v. *Williams*, 15 Ves., 427.

This rule applied to tenants for life, who held with an express grant in the deed of exemption from waste, and also to tenant in tail after possibility of issue extinct, or one who held a determinable fee, because the two last mentioned might have had an estate of inheritance. Bisham's Principles of Equity, § 434; *Cooke* v. *Whaley*, 1 Eq. Ab., 400; Pom. Eq. Jur., § 1348, note 3.

In *Davis* v. *Gilliam*, 5 Ired. Eq., 308, this Court recognized the reason of the rule also, in holding that "the husband was dispunishable for waste, because, while in possession he was tenant for life in his own right, but was seized with his wife in fee in her right."

The ordinary life tenant, liable for waste, is allowed, without restraint, to clear as much of the timbered land, on his estate, for cultivation as a prudent owner in fee simple would, and sell the timber that grew on that part. *Crawley* v. *Timberlake*, 2 Ired. Eq., 460; *Davis* v. *Gilliam, supra.*

The rule laid down in the opinion of the Court gives the defendant in this action harder measure than is meted out to an ordinary life tenant, in confining his right to cutting trees "necessary for the reasonable use of the homestead property, for making repairs, necessary houses, fences and the like." As has been well suggested by Justice DAVIS, it would be just and reasonable, now that timber trees are everywhere being converted into timber for market, and so many new industries are springing up to consume the product from the saw-mills that are being planted in almost every forest, to allow even ordinary life tenants more latitude in disposing of trees. If the owner of a homestead, however his right may be designated, is denied by the courts the privilege of cutting fifty dollars' worth of timber from a homestead worth nine hundred dollars, even for the purpose of paying off a judgment for fifty dollars, then his condition would be better if the Court would go further, and appoint a receiver to sell the timber and apply the proceeds in discharge of liens. Such a remedy would better accord with the idea that the defendant in this case is still the owner of an estate in fee simple and liable to a charge. It is more just and reasonable that the charge should be satisfied out of the proceeds of the sale of trees than held till the expiration of the so-called exemption, and then used to buy the land and trees *usque ad cœlum*. The law, as applied in this

case, calls the " homesteader " an owner in fee entitled to the privilege of exemption, but declares his home subject to a lien—that is, a charge—and operates so as to give the holder of the lien the power to prevent his selling his pine trees suitable for timber, as any other tenant in fee would do. Truly, it would seem, that the Constitution has promised bread and the Courts have given a stone, if this new depart- ure in the way of constitutional construction has come to remain a permanent part of our law. The opinion of the Court sometimes seems to be predicated upon the idea of deal- ing with life estates and remainders or reversions, and again with judgments, charges and rights. In order to meet every aspect of the argument, I have arrived at a second proposi- tion, embodying, as I believe, the correct interpretation of Article X.

2. If the homestead be not an estate, but a mere personal right of a land-owner to hold one thousand dollars in value of land, not liable to sale under execution for debt, still the *Constitution, in express terms,* gives the further exclusive right of enjoying the " *rents* and *profits,*" arising out of the homestead, to the persons entitled to it, and thereby grants exemption from impeachment for waste, *which carries with it a license, not only to use the rents* of the farming land, but to appropriate the *products* of the *mines* and the proceeds of the *sale of forest tim- ber trees,* taken from the whole homestead, as *free from restraint* or *interference* as when the fee simple is held subject to no lien whatever.

A review of Article X of the Constitution will show the strength of this position, if we will consider all of the sec- tions that grant and define the right together as in *pari materia.* Section two gives the owner of land the power to select the location of the homestead on his own land, not to exceed in value one thousand dollars, and declares it " exempt from sale under execution for debt or any other final process," but does not in terms declare the duration of

the exemption   We are left to sections three and five for further explanation.   Section three provides that " *the homestead, after the death of the owner thereof,* shall be exempt from *the payment of any debt* during the minority of the children, or any one of them." Here, for the first time, we find the indirect declaration that the owner is to hold the homestead till his death, and then the term of exemption is to be extended during the minority of any child. Still there is no suggestion as to the *nature of the dominion,* that is to be exercised over the ' territory from which the Sheriff is expelled.

When we reach section *five* we find, first, the exemption prolonged, on certain conditions, during the *widowhood* of the owner's wife, and then the definition of the extent, not only of her rights, but of those of the husband and children, in the enjoyment of the exempted land. Section *five* provides : " If the owner of a homestead die, leaving a widow but no children, the same shall be *exempt from the debts of the husband, and the rents and profits thereof shall inure to her benefit during her widowhood,* unless she be the owner of a homestead in her own right."

It will not be contended that the Constitution should be construed to give the widow, while she remains single, any peculiar power over the land, or exclusive privilege in the enjoyment of it, not extended to the husband or infant child.

Every rule of construction would lead us to consider these sections, as a whole, declaring first, that there shall be an exempt estate, and where and how selected, and then that it shall extend during the life of the owner, the minority of the children, and contingently during the widowhood of the wife, and lastly, how the rents and profits shall be enjoyed. Both of these words are terms known to the law, · have a legal meaning, and it must be understood that those who

laid the foundation of our political edifice understood their legal significance, and intended that they should be interpreted accordingly.

In Rapalje and Lawrence's Law Dictionary, it is said: "In the law of real property, 'Profit' is used in a special sense, to denote a produce or part of the soil of land. Therefore, 'if a man, seized of lands in fee, by his deed, granteth to another the profit of those lands, to have and to hold to him and his heirs, and maketh livery, *secundum formam chartæ*, the whole land itself doth pass; for what is the land but the profits thereof; for thereby *vesture, herbage, trees, mines* and all, whatsoever parcel, of that land doth pass.'" Coke Litt., 46.

If the grant of the profits in land by the owner to another carried with it, *ex vi termini*, the trees on the land, why should the sovereign State, under which all the lands within its borders are holden, in conferring upon the land-owner the rights of exemption and enjoyment during such exemption in his lands, be deemed not to have used "profits" in its apt legal sense, and to have granted for the time prescribed the unrestricted use of mines and timber trees thereon?  To the same effect is Bouvier's definition: "Under the term profits is comprehended the produce of the soil, whether it arise above or below the surface, as *herbage, wood*, turf, coals, minerals, stones, also fish in a pond or running water." The damages that were recovered in an action against a trespasser for occupation from the disseizin till the recovery, were called mesne profits, and the plaintiff in such action recovered not only a reasonable rent for agricultural products, but for timber trees cut down and new mines opened and worked.  Rents would have included the damage arising out of crops raised, but a broader generic term was needed, and hence the action was called one of trespass for "mesne (or intervening) profits." See Rapalje and Lawrence's Law Dict., and Bouvier's Law Dict., definition of sne profits.

If the sovereign State, in its organic law, has not invested every citizen who owns a homestead with the right to the untrammeled use of mines, timber, stone, and everything that might be used or consumed by an owner of a life estate in England, conveyed to him, coupled with exemption from waste, then it must be because the State has no power to grant the privilege, or because by a strained construction we distort the meaning of words that have had a known significance as far back as the time of Lord Coke. I cannot concede that this privilege of enjoying profits of every kind can be ruthlessly snatched from a grantee of a privilege, held by virtue of the fundamental law from the sovereign State, under the specious pretext that he is lessening the security of one who extended him credit, with a knowledge of the Constitution, and as much subject to its provisions as if they had been incorporated in the note given for his debt. Moreover, it will be observed, that the personal property mentioned in the first section of Article X, is declared exempt from sale under execution or other final process, and the debtor's right to it depends entirely upon that declaration. Yet it is held that he has the unrestricted power to dispose of personal property assigned him, and to have other articles exempted in a re-assignment made to him, even though the judgment creditor's security may be diminished. *Durham* v. *Speeke*, 82 N. C., 87.

This section is mentioned to show, that the construction given it by this Court is in harmony with the idea, that the purpose of the framers of the Constitution was not only to exempt the property, real and personal, assigned for the debtor's family from seizure, levy or sale, but from interference or control on the part of the creditor. In *Bank* v. *Green*, 78 N. C., 247, Justice BYNUM, for the Court (speaking of Article X and the "subsidiary statutes"), says: "*Their legal effect is simply to protect the occupant in the enjoyment of the land set apart as a homestead, unmolested by his creditors.*"

Chief Justice SMITH, delivering the opinion in *Markham* v. *Hicks*, 90 N. C., 204, states the rule still more forcibly: "They (the Constitution and statutes in reference to exemption) place the property, when ascertained and set apart, outside of that which the creditor may seize and appropriate to his judgment, *as if for the time the debtor did not own it.*"

But it is contended that the plain letter of the Constitution must be disregarded, the spirit that inspired the Convention ignored, and the rights of one holding this favored family franchise from the State determined by analogy to the ruling of this Court, in a case where the debtor belonged to a class expressly excluded from claiming a homestead in their lands.

In *McKethan* v. *Terry*, 64 N. C., 25, this Court held that where a *fi. fa.* was issued and levied on land in December, 1867, it was liable to sale on a *ven. ex.* issued on the judgment in 1869, discharged of any homestead right, because by the levy a specific lien had been acquired.

In the case of *Webb* v. *Boyle*, 63 N. C., 271, which is the sole reliance of the Court, among our own decisions, to sustain the position that the owner in fee simple of land can be restrained from cutting timber by a judgment creditor, an execution had been issued and a levy made upon the land in 1861, and again in 1867, when the creditor was prevented, by military orders and stay laws, from selling. Boyle, the debtor, therefore, had no right to a homestead in his lands. If his land had been subject to the homestead provisions of the Constitution, Justice DICK, who subsequently delivered also the opinion of the Court in *Poe* v. *Hardie*, would have adverted to the fact that an occupant holding without impeachment for waste, was being restrained from any destruction of timber, not wanton, malicious or extravagant. Conceding the principle contended for as established by the case of *Webb* v. *Boyle*, it was applied there to land in which the owner could not claim a homestead, and it is therefore distinguishable from this case.

But it may be well to note the fact that, of the authorities cited in *Webb* v *Boyle*, not one relates in the remotest degree to or tends to establish the new doctrine, that a judgment creditor can in any case enjoin the debtor from committing ordinary waste, such as cutting or disposing of pine timber trees on his land. The section (455) in High on Injunctions, cited in support of the decision, is based entirely upon *Webb* v. *Boyle*—is, in effect, a quotation from it. I have shown that it is not in point, if adhered to by this Court as correct. But it is a significant fact, that so careful and discriminating a writer as Mr. Pomeroy, has, in his work on Equity Jurisprudence, neither cited *Webb* v. *Boyle*, nor noticed the extreme principle enunciated in it. In a somewhat extended examination of authorities, I have failed to find the case cited with approval by any other Court or writer, or alluded to, except in the short section of High on Injunctions, embodying a syllabus of the opinion, inserted in his work without comment, as we infer, to show the *ultima thule* to which a Court stretched its equitable jurisdiction at the close of a gigantic and exciting civil war, when the lines that defined the powers and duties of Courts, in the protection of private rights, were so far obscured that gross usurpations of authority were recognized as lawful legislation, and sanctioned by the judicial departments of State governments.

It would seem, from an examination of sections 421 and 431 of High on Injunctions, that the author does not, in fact, concur in the doctrine laid down in *Webb* v. *Boyle*.

While the syllabus in *Camp* v. *Bates* is misleading, when we examine the facts we find that the Court granted an order to restrain an insolvent debtor, at the instance of a creditor who had levied an attachment on his land, upon the allegation that the defendant had committed waste " by cutting down and carrying away *the young wood* and *timber* growing

102—13

*thereon*, and that he threatens to cut down, carry away and convert to his own use, *all the wood* and *timber and fruit trees, which would render it of little value* or *security* to the *plaintiff*, and the plaintiff was apprehensive this would be done before he could obtain judgment and execution in said suit." The learned Chief Justice rests his decision entirely upon the nature of the threatened waste, when he says: "The possession, therefore, has always been suffered to remain unmolested so long as he contented himself with *ordinary* returns. This seems necessary, that the property may not be abandoned; but *it can confer no right to do such acts as are charged in this bill—acts of wanton and malicious waste.*"

It is not contended that when the defendant made a contract, such as thousands of the citizens of the State have made within a recent period, to sell the "timber trees," (understood everywhere to mean the trees large enough to be valuable for the purpose of sawing into lumber), that he thereby threatened a wanton or malicious destruction, like one who cuts down fruit trees. Nor can it be successfully maintained, on reason or authority, that the judgment debtor, with right of homestead in his lands, is no more protected against the interference of the judgment creditor than the mortgagor is against restraint, on complaint of the mortgagee, for diminishing his security. The mortgagor is only a tenant at will of the mortgagee as to the mortgaged land, while the mortgagee has the right to take possession if his debt is not paid, and receive the rents of the land—is really, in law, the owner of the land. The defendant in this case is the owner in fee of a tract of land worth less than one thousand dollars. The creditor has no estate or right in the land—only a lien on it as a security for his debt. The laws of North Carolina do not recognize in the judgment creditor one who has a charge on the land. He has no power to touch an ear of corn or a blade of grass raised thereon, and he is as much a trespasser, if he attempts to exercise own-

ership, as if he held no claim against the debtor. By what arbitrary rule, then, can we defy the Constitution and declare the homestead right one of no higher dignity than a tenancy at will under the creditor? The words *charge upon land* are used in a general sense, to mean any claim to satisfy which it is liable to be sold (see Rapalje and Lawrence's Dictionary), and a homestead may eventually be sold to satisfy a judgment docketed in the county.

The case of *Gordon* v. *Lowther*, 75 N. C., 193, cited in the opinion to sustain the power of the Court to grant injunction, is one in which Justice SETTLE, for the Court, justifies the granting of injunction against the defendant on the ground that she was "a tenant for life with contingent remainder in fee," &c. But it is contended that the defendant in this case must be treated as the owner in fee. If so, I maintain that the sovereign has granted him an exemption from impeachment for waste, and a *consequent exemption from* injunction against any but wanton, malicious or extravagant waste, as distinctly as the exemption from sale under execution for debt as to his land, and for the same period. If an estate of less dignity than a fee simple is marked out by the Constitution as the measure of the debtor's right, when the land becomes liable to a lien, then I contend that the estate is a determinable fee, the holder of which would be exempt from impeachment for waste by the common law as well as by the express grant of the profits in the Constitution, and, according to all the authorities in England and America, would not be subject to restraint by a court of chancery, except for wanton, malicious or extravagant waste.

*Braswell* v. *Morehead*, Bus. Eq., 26, is the only remaining authority relied on to establish the plaintiff's right to extraordinary relief.

The principle decided there was, that one holding a contingent estate by executory devise in slaves was entitled to an order restraining the guardian of an infant, whose right

to the absolute property in said slaves would accrue on the contingency that she should attain the age of twenty-one, from removing the slaves from the State till the infant should arrive at said age.    I cannot see, therefore, how the right of the plaintiff to the injunction is sustained by that authority. I am not disposed to doubt that a docketed judgment creates a lien upon the land of the debtor in the county where it is entered, though the statute does not purport to convert that lien into a charge, but merely defines the rights of the creditor as to priority.

In *McKethan* v. *Terry, supra,* the Court declared that an actual levy before 1868 created a specific lien, which was superior to the homestead right; while it was there held, on the contrary, that a judgment docketed in the county did not defeat the right.    We do not deem it material to determine whether a docketed judgment, obtained on a contract made since the homestead provision was enacted (in 1868), has the force of a levy.    The force of a levy is not sufficient to destroy a right of exemption from restraint or accountability for the enjoyment of the homestead profits, short of wanton or malicious destruction, derived directly or by implication from the Constitution.    Moreover, it is settled that even where the judgment has been rendered on a debt contracted prior to the passage of the homestead law, the Sheriff is required to lay off the homestead in the judgment debtor's land, and levy execution on the excess.    A judgment upon an old debt, therefore, does not operate as a specific lien and defeat the homestead right, if the excess sells for a sum sufficient to satisfy the debt.    *Arnold* v. *Estis,* 92 N. C., 162.

The effect of the ruling of this Court is either to treat the owner of a homestead as a life tenant, or by the other theory to invite thousands of judgment creditors to establish a systematic espionage upon their debtors and bring them into Court to determine in the future, and as cases arise, when

the "homesteader" shall cross the line of accountability in the exercise of dominion over his land.

Uncertainty as to rights in property is next to a want of security in its detrimental effects upon the public. And this fact furnishes another reason for adhering to the well marked line, and holding that the "homesteader" could only be restrained from wanton or malicious waste, while the ordinary life tenant is entitled to destroy no more timber upon the land, outside of that necessary for fire-wood and repairs of house and fencing, than a prudent owner in fee simple, following the customs of the neighborhood. and in the exercise of good husbandry, would use.

SMITH, C. J. (concurring). It is with some reluctance, after a full discussion in the separate opposing opinions of the other members of the divided Court, that I feel constrained to enter into the controversy and express my concurrence in the reasoning and the results of those which thereby, in this diversity of views, become the rulings and constitute the adjudication in the cause. This duty, undertaken, not because the prevailing opinions are not sufficiently self-vindicative and require other and further supporting argument, becomes imperative in view of the tendency of the dissents, one of which comes from a thorough and elaborate examination of the authorities, reaching back to the introduction of the new subject of land exemption from final process for debt, since a prolific source of controversy, to unsettle adjudications, and to impair confidence in their integrity and performance, which have been considered as a final determination of the questions presented and decided. I can scarcely deem any evil in the administration of judicial functions in declaring and defining the law, and especially that in ascertaining the meaning of constitutional and statutory legislation, in its effect upon existing law, greater than that which springs from conflicting decisions and a want of

regard shown in the latter in departing from the rulings
made in those that precede, thus rendering personal and
property rights acquired insecure and uncertain. Except in
decisions palpably erroneous, and left untouched, leading to
serious, disastrous consequences, as well as disturbing the
equilibrium of the system, the maxim, " *stare decisis*," imposes
an obligation to adhere to former adjudications. When the
attention of the Court was early directed to a considera-
tion of the effect and extent of the changes produced
by the introduction into the organic law of the exemption
of the debtor's real estate, of limited value and for a limited
time, from the reach of final process for debt, analogies were
sought in the principles of the common law that apply to
a divided estate, one present and one future, and, perhaps,
contingent, and the respective rights of each to the land,
with a view of deducing from them some rule applicable to
the nondescript designated as a *homestead.* It was called
" a determinable fee," " a quality annexed to land whereby
the estate is exempted from sale under execution," and the
interest beyond the period of exemption, " a reversion,"
terms appropriate to estates separated into parts owned by
different persons, but wholly unsuited to a mere freedom
from liability for sale at the instance of a creditor.

The dissenting opinion seems to go back and revive the
use of these obsolete terms, and to derive from them rules
that govern the relations of owners of separate estates by the
common law in respect to their interest in the land, with a
view to their adaptation to the homestead. · It was needless
to do this in support of the argument that denies any relief,
under the circumstances of the present case, to the restrained
creditor; for if the creditor's estate undergoes no change by
reason of the exemption and the assignment of its bounda-
ries, as declared in the case of *Bank* v. *Green*, decided in 1878,
and since uniformly upheld, the debtor having, as before,
the same full and unabridged estate, could exercise, at least

as much, if not more, control over the land than if it had been lessened, as indicated by the inappropriate terms to which reference has already been made. It was not necessary for the purpose of the argument, therefore, to recall the cases anterior to that decided in 1878, which is perspicuous and clear as an exposition of the Constitution, and, in the language of Brother SHEPHERD, has "swept away, by convincing logic," the confused and inconsistent interpretations put upon the Constitution as implied in the employment of terms drawn from the common law in causes previously before the Court.

The true mode of arriving at the meaning of the provisions relating to the exemption of land as a homestead is to look at its terms and the purpose to be attained. The primary object was to secure a *home* to the unfortunate and insolvent debtor and his family, and to this end the prohibiting mandate is addressed to the creditor and the officer of the law acting in his behalf, forbidding the sale of so much of the land as is exempted, either under execution or other final process for the enforcement of a debt, except it be for taxes or the purchase money due for the land itself thus exempt. This is for the relief of the debtor and to prevent himself and family from expulsion from their home, or such land as he may choose to make his home on. It seems the home or " homestead " which designates the exempt land on which he has, or may make his home, to his and their use, for its full and undisturbed enjoyment for the time being, with all the privileges incident to such enjoyment, as a prudent and unfettered owner would use it in expectation of its indefinite continuance as his own home. This secures all the beneficent purposes of the law, and all it is intended to accomplish.

I cannot, for one moment, assent to the suggestion that the expression found in section 5, that gives the surviving widow, when the debtor dies childless, " the rents and profits thereof"

during widowhood, enlarges the estate in her beyond that which her husband had, or that those words which define her interest in the land when the estate, if an inheritance, has descended to heirs, and in no sense rests in her, unless under a claim of dower, do more than define her rights therein. The purpose, in their use, is to bestow an enjoyment and use of the land commensurate with that of her deceased husband, when undisposed of by their joint deed of alienation. No argument, which interprets the words as equivalent to a conveyance of the land for her life or widowhood, can derive any force from their effect in a deed from one person to another. The expression means to confer upon her the right to appropriate to her own use the accruing profits and fruits of the possession and use, leaving the descended inheritance to whom the law gives it when undevised. It rather furnishes a reason for circumscribing the enjoyment of the owner in respect to creditors whose rights are in abeyance.

It is conceded in both dissenting opinions that the Court might intervene and restrain the owner and occupant of the exempt land from committing wanton and malicious waste, when endangering the judgment debt, and thus they admit the interest of the creditor, who has a docketed judgment, in the land under its lien sufficient to authorize him to ask the exercise of an interposing power to prevent such waste as this, and this would be an interrupted possession of the debtor, or rather the putting a restriction upon the use he is making of it. But this is not a voluntary interference with the rightful and legitimate enjoyment secured to him. It is brought on by his own improper and unlawful use of the land, against which the law does not give him protection, and it follows, that he is not in the same position, as to the property, though full owner, as he would be were there no debt or judgment lien to secure it.

It thus becomes a question, as to how far and when the equitable power of the Court will be put forth to restrain the defendant from acts that are not done in reasonable and full enjoyment of the homestead, but from spoliation, and to convert the substance into money at the debtor's absolute disposal, and endangering the debt itself. It seems to me plain, the limit as properly fixed in the opinions with which this is in harmony, and if the exempt land consists entirely or largely of forest trees, valuable only in being worked into lumber, a right to cut down, for the purpose of use or for sale, is possessed, to a reasonable extent, as would be the working of mines by the owner, because, in such case, there would otherwise be no means of enjoyment, or not as full enjoyment of the land. But it must not be forgotten that creditors have some rights that ought not to be lost sight of and disregarded, in giving efficacy to these provisions in behalf of the debtor, nor are they in any view of the law.

The statute, in express terms, gives the lien to the docketed judgment, by the amendatory act of 1885, ch. 359, changing the law as it previously existed in *The Code*, § 501, subsec. 4, as interpreted in *Markham* v. *Hicks, ante*; *Rankin* v. *Shaw*, 94 N. C., 405. This enactment not only gives the lien, but it arrests the running of the statute of limitations during the continuance of the exemption, while the creditor is disabled from enforcing it.

This lien is created by the act of docketing, and *eo instanti* attaches to the debtor's estate in the land, and there is nothing else to which it can adhere, but its enforcement is defined by the law until the exemption expires. There is no undefined, shadowy interest springing into existence in the future, to which the lien then attaches itself, meanwhile awaiting its advent, but *it fastens at once upon the estate* of the debtor in the land, to be enforced at a future uncertain time.

This gives the creditor a *present interest* in the land as a security for his debt, and leaves the debtor free to do whatever an owner, not in debt by docketed judgment, could do with his own property, with the single proviso that he must not carry his spoliations, not necessary to the full enjoyment of the premises, so far as to impair the security they afford to his debt. If the legitimate use of the land impairs the value of the security, or if a reasonable portion of that which could only be used and enjoyed by a destruction, be taken and appropriated, as in a forest growth or a mineral bed, thus making a partial denudation, the creditor must submit; but when such is not necessary to the enjoyment of the land as a whole, the creditor ought not to be, nor, in my opinion, is he, left remediless.

Surely when the sovereign, the State, says to the creditor, you shall not take the home of your debtor and put him and his family out into the world homeless and penniless, and you must therefore wait for your debt, but you may secure it by prosecuting your demand for judgment and enforce payment hereafter, it did not mean to say to him, your debtor may use the property in any way he may deem most to his own advantage in the meantime—he may remove the houses, he may destroy all the timber and convert it to his own use, leaving the premises, it may be, well-nigh worthless, and you cannot be allowed to complain, unless he was prompted by mere wantonness or a malicious motive, and did not do the act for personal advantage only. It is said the lien gives no interest in the land to be protected by the Court. It is not necessary to review the authorities to the contrary, recited in the opinion by Brother MERRIMON, sharply criticised in the dissenting opinion, but whose authority remains, in my view, unshaken, of which I will only say that of *Webb* v. *Boyle*, 63 N. C., 271, is directly in point and conclusive of the question of right; for there can be no stronger claim for protection to a creditor who has obtained a lien by the levy

of an execution on the land than to a creditor to whom the law gives it in a docketed judgment. The correctness of the rule admits of illustration in the case of land devised to one charged with a legacy in favor of another, or an annuity payable at intervals. Can the devisee commit waste, *ad libitum*, when for his own benefit, without incurring a liability to be restrained, and thus be allowed to impair the value of the property to a degree rendering the security insufficient or precarious? And must the legatee, with no power to interfere, submit in silence to the wrong and lose the annuity, or a part of it, because of action of the devisee? And if the annuitant has a status in court, and may ask its assistance, may not the creditor do so under like circumstances? Is there any essential difference in the cases? It is intimated that upon the construction insisted on, which prevents a sale of timber, even though necessary to a full enjoyment of the farm, would be a promise in the Constitution to give bread, while the Court would be, by construction, giving a stone to the helpless insolvent. But the case may bear another and quite different aspect, if the dissenting views obtain, and it could be as well said that the Constitution gives bread to the debtor, a stone to the creditor. It does neither. It undertakes to do justly by both, and so to adjust their relations, that while one retains his house for a time, and wife and infant children are cared for, the creditor is made meanwhile to wait, with the security the law gives him, and permitted to proceed to collect when the time expires. This is the administration of impartial justice, and there ought to be no conflict of interest arising therefrom.

If the creditor may harass the debtor (and this he cannot do when the latter keeps within the prescribed limits in the use of the land), so may the possession of the homestead, carrying with it a right to destroy as well as to enjoy its substance, if for his supposed benefit, and not wanton or malicious, enable the debtor to wrong the creditor, if so dis-

posed to act. It is said in the dissenting opinion, that the
ruling of the Court " will tend to enable thousands of judg-
ment creditors to establish a system of espionage upon the
debtors, to determine in the future, and as cases arise, when
the homesteader shall cross the line of accountability in
the exercise of dominion over his land." The same disas-
trous consequences might follow the recognition of the rule
that admits the creditor's interference in any case, even to
put a stop to wanton or malicious waste, the only escape
from which is in denying the right to interfere in any case.
If the only limitation put upon the debtor, in his possession
and use of the premises, be that his waste and spoliation will
be only stopped when they proceed from a wanton· or mali-
·cious spirit, then may he leave to his creditors but a flesh-
less carcass, stripped of what gave it value, to be subjected
to his debt. This cannot be the intent of the law. What
difference can it make to the creditor, with what spirit or for
what purpose the despoiling may be done ? It is the needless
waste and despoiling of which he complains—the fact of
impaired value of the land to his hurt—and this not less when
done for a personal benefit than if prompted by malice or wan-
tonness. If the creditor is to suffer loss in the impaired value
of the security resulting from the acts of the debtor done
in the furtherance of his supposed personal interest—yet
needless to the full enjoyment and use of the premises, as a
present and protected home—what matters it to the former
that it is not from wantonness or the promptings of ill will ?
The injury and damage is the same to the creditor, and it
is against them that he is entitled to be protected, if protected
at all. The rule that marks and defines the rights of parties,
during their relation in respect to the property, is consider-
ately and equitably laid down in the opinion of the majority
of the Court, and, passing between extremes, adopted to
secure repose in the preservation of the rights of each.

JONES *v.* BRITTON.

Some criticism, in my opinion not merited, is made upon the case of *Gordon* v. *Lowther*, 75 N. C., 193, of which it is only necessary to say that as a correct assertion of the law it has been approved and followed in a case decided but a year ago, *Cowand* v. *Meyers*, 99 N. C., 198. But if there were no direct authority to be found, the right to be protected against the lawless and injurious misconduct of one possessed of a present estate, by one who has a remote interest therein, is clearly and distinctly recognized as an important function of a court of equity, interposing to prevent a wrong for which the strict rules of law afford no redress, and the principle has been so uniformly declared that no references are needed in its support. The idea that this concession will warrant the appointment of a receiver, and take the homestead away from the occupant, finds no support in the doctrine of interference to prevent *abuse* of the premises, for the debtor has the right to the occupancy and enjoyment of his secured home, with all the proper incidents, and is restricted from going beyond the assigned limits, nothing more, and precisely the same difficulty will be encountered when it is sought to confine him within the limits fixed by the opposing view. In either case, it is simply a restraint against unauthorized misuse.

It is a source of deep regret that the divergent views entertained by my brothers upon the point discussed could not be brought in harmony, tending, as they do, to impair confidence in the soundness and permanence of the decisions of the Court. So seriously has this been felt, that it has been thought and suggested that it would be better, to avoid such injurious consequences, that no dissenting opinions be filed. Without concurring in this, it is of the highest importance that the court of last resort, whenever practicable, without the surrender of strong convictions, should arrive at a common conclusion, in declaring the law.

PER CURIAM. Error.